HOWARD UNIVERSITY, Plaintiff,

v.

The NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, et al., Defendants.

Civ. A. No. 87–3206.

United States District Court, District of Columbia.

Nov. 27, 1987.

Francis S. Smith, Washington, D.C., for plaintiff.

Donald T. Bucklin, Washington, D.C., for defendants.

## MEMORANDUM ORDER

JOHN GARRETT PENN, District Judge.

The plaintiff filed this action, in which it seeks declaratory and injunctive relief and damages, on November 25, 1987. The plaintiff asserts that the case is filed pursuant to the Sherman Anti–Trust Act, specifically, 15 U.S.C. §§ 1 and 2, the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, 11 D.C. Code § 11–921 and D.C. Code §§ 28–4502 and 28–4503.

The case is now before the Court on plaintiff's motion for a temporary restraining order in which it seeks to have the Court restrain the defendants "from continuing to exclude the Howard University football team from post-season Division I–AA competition and from holding any Division I–AA Championship games until this action is decided."

### I

Briefly, the underlying facts are as follows: The plaintiff is an institution of higher learning with its principal place of business in the District of Columbia. The defendant National Collegiate Athletic Association (NCAA) is an unincorporated athletic federation of colleges and universities, and the individual defendants, Bernard Cooper, Benny Hollis, Walter Reed and Rick Taylor are members of the NCAA Division I–AA Football. Committee and serve respectively as chairpersons of the advisory committees for the Central Region, West Region, South Region and East Region.

The plaintiff is one of seven teams in the Mid–Eastern Athletic Conference (MEAC). Each of the seven teams are classified as

NCAA Division I–AA schools and all of the institutions in the MEAC are known to be historically Black colleges and universities. At the conclusion of the regular football season, the plaintiff's football team was declared to be the champion of the MEAC after having defeated all of the teams in that conference that it competed against.[1] In addition to winning all of its conference contests, the plaintiff defeated all of its non-conference opponents except for Towson State (of Maryland). It completed its regular season with a record of 9 wins and 1 loss, one of the best records of all Division I–AA teams.[2]

The statistics achieved by the plaintiff's football team demonstrated outstanding athletic performance. During the year it gained an average of 381.6 yards per game rushing, was first in rushing offense and second in total offense, had the highest average yards per rush, scored the most touchdowns by rushing per game, kicked the fewest number of punts per game and earned the most first downs per game by rushing. The plaintiff also had the number one rushing player in the country, Harvey Reed, who averaged 151.2 yards per game and 7.2 yards per carry.[3]

The Division I–AA Football Championship provides for a maximum field of 16 teams. The top two independent teams, *as evaluated by the Division I–AA Football Committee,* automatically receive berths and six (apparently stated erroneously as seven in the 1987 National Collegiate Championships, Division I–AA Football (1987 Handbook)) allied conferences receive automatic qualifications for the 1987 Championship. The remaining teams are selected at-large by the Football Committee.

Howard University's football team does not participate in a conference that receives an automatic qualification for the 1987 Championship; therefore, to participate in the post-season Championship, it must rely on an at-large invitation.

Prior to its last regular season game, which was held on November 21, 1987, the plaintiff's football team was ranked number 20 in the official ranking of the Football Committee, and tied with North Texas State. Both teams had one final regular season game. Howard was scheduled to play Delaware State University which had been ranked number 14 prior to the final game, while North Texas State was scheduled to play Louisiana Tech, which the Court understands had a record of 3 wins and 7 losses. Louisiana Tech was not ranked and had not been ranked on October 26, November 2, 9, and 16.[4] Howard defeated Delaware State by a score of 12 to 7, while North Texas State defeated Louisiana Tech by a score of 10 to 5. Based upon those records, Howard received a final ranking of number 18, while North Texas State received a final ranking of number 16. Since Holy Cross could not participate in the playoff, any ranking of 17 or better placed a team in the Championship playoffs. Howard had missed by one place.

The plaintiff now seeks to have this Court restrain the defendants from beginning the Championship playoffs until after the Court has decided this case.[5]

---

1. It appears, however, that the MEAC does not complete its schedule until November 28, 1987 when Bethune–Cookman and Florida A & M College play a game. Both teams are members of the MEAC. Apparently this final game will not affect the plaintiff's standing as conference champion.

2. Only Holy Cross College, which was the top ranked team in the Division I–AA ranking, had a better record, 11 wins and no losses.

3. Of course it is not fair to judge the team just on its statistics because obviously, the quality of its opponents will affect those figures.

4. The Court does not have any earlier ranking of any team.

5. Actually, a temporary restraining order would remain in effect for ten days unless extended. At or about that time, the Court would hear plaintiff's motion for a preliminary injunction, and it granted, the status quo would be maintained until a decision on the merits. *See* Fed. R.Civ.P. 65.

## II

In order to be entitled to injunctive relief, the plaintiff must demonstrate that it is likely to prevail on the merits, that it will suffer irreparable harm if injunctive relief is not granted, that other parties to the action will not suffer substantial harm if injunctive relief is granted, and that the public interest would be served by the granting of such relief, or in any event, that the granting of such relief would not be adverse to the public interest. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 182 U.S. App.D.C. 220, 222, 559 F.2d 841, 843 (1977). *See also, Virginia Petroleum Jobbers Association v. FPC,* 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958). Moreover, "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors." *Id.*

### A. *Likelihood of Success on the Merits.*

Turning to the merits of the case, the case has just been filed and the parties have not had an opportunity to undertake discovery. But, based on the present record, there must be a question as to whether the defendants followed their own regulations and the 1987 Football Handbook. While, because of time constraints, the Court cannot address all of the arguments made at the hearing, it notes that one issue in particular raises serious questions.

As noted earlier, Part I, *supra,* Howard and North Texas State had been tied for number 20 in the rankings, yet, after the game and just prior to the decision on which teams would participate in the Championship competition, the ranking of Howard improved to only number 18, thereby eliminating it from the Championship series, while the ranking of North Texas State improved to number 16, thereby guaranteeing that it could participate in the Championship series. The question of the relative change of ranking is posed because Howard played the number 14 team and won by five points while North Texas State played a team unranked and with a losing record and also won by five points. Logic would seem to suggest that under those facts, no matter how North Texas State and Howard were ranked the following day, Howard would have the higher ranking.

At the hearing, the defendant NCAA[6], for the first time, appears to suggest that the earlier rankings assigned to the colleges in Division I–AA were not necessarily accurate, and that Delaware State, which had been ranked as number 7 on November 9, and number 14 on November 16, had not been deserving of that rank on November 16, but that the Football Committee, instead of expelling it from the ranked colleges, split the difference and ranked the school number 14. Based upon the present record, the reasoning behind this argument escapes the Court. Delaware State went into the game with Howard with a 7–2 record, and if a weakness in the Delaware State football team had suddenly come to light, it is not clear why the school was only dropped to number 14.

A further issue raises yet additional questions. In suggesting that the NCAA refused to give Howard a slot in the Championship series because of the quality or lack of quality of some of its opponents, the defendants appear to overlook the fact that the same committee had ranked both Howard and North Taxes State number 20 the prior week.

### B. *The issue of irreparable harm.*

The plaintiff contends that it will suffer irreparable harm, in the event injunctive relief is denied. While it is true that the school and its players will suffer injury, because, neither this Court nor any other body can restore the school to this place in time, with its present football team, the plaintiff may nevertheless recover damages if it is ultimately successful in this action. No doubt, there is considerable

---

6. The other defendants were not present and were not represented by counsel and it is unclear whether they have been served.

harm to the team, and especially for those seniors who will never have another opportunity to play for Howard. But, in considering this issue, the Court must balance the potential loss to the school and its players and team against the potential injury which would be suffered by the 16 schools which have already arrived at the sites of their games for the first round of the tournament.

## C. The Risk of Substantial Harm to Others.

It goes without saying that money has already been expended, by the NCAA, the schools, and presumably, many of their fans and supporters. To postpone the games at this point in time would affect the entire schedule. Under the present plans, made more than one year ago, the teams will play eight games on November 28, and thereby reduce the field to eight teams. Those teams will play in the second round, reducing the teams to four, then a semi-final series and then the Championship game in Pocatello, Idaho on December 19, 1987 where arrangements have been made to televise the game over ESPN. Any delay in the series will affect the ability of the NCAA to perform under its contracts.

Furthermore, a delay in the games at this point will make it necessary for those fans and supporters who have travelled to the game sites, to make arrangements to remain in these areas pending resolution of the present dispute, or more likely, to make arrangements to return to their homes. In short, any delay of the games at this point will be disruptive and cause severe hardship to the teams, the schools and their supporters. Such a disruption will also cause hardship to any number of other persons including, but not limited to concessions operators.

## D. Public Interest.

Little need be said at this point of the question of the public interest. It appears, based upon the above, that the public interest will best be served by allowing the games to go forward.

## III

In sum, the Court concludes that the plaintiff's motion for a temporary restraining order must be denied. While the plaintiff has demonstrated the likelihood of some harm, it may also seek redress by way of damages. While this Court is sympathetic to the plight of the Howard University team, the decision on a request for injunctive relief must be made based upon the guidelines set forth above.

It is hereby

ORDERED that plaintiff's motion for a temporary restraining order is denied.